IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| CARL B. COLLINS and FARZIN DAVANLOO, <br>     *Plaintiffs*, <br><br> v. <br><br> WESTERN DIGITAL TECHNOLOGIES, INC., et al., <br>     *Defendants*. | CIVIL ACTION NO. 2:09-cv-219-TJW |

## **MEMORANDUM OPINION AND ORDER**

Pending before the Court is Intervener Suhas Wagal's ("Dr. Wagal") Motion to Intervene (Dkt. No. 201). In his motion, Dr. Wagal moves to intervene in this patent infringement lawsuit to establish that he is a co-inventor of the two asserted patents—United States Patent Nos. 5,411,797 ("the '797 patent") and 5,478,650 ("the '660 patent") (collectively the "patents-in-suit"). The Court held a hearing on this motion on August 22, 2011. Having considered the arguments of the parties, the evidence, and the applicable law, the Court DENIES the motion for the reasons discussed below.

### I.   Background

Plaintiffs filed this patent infringement lawsuit on July 15, 2007 against numerous defendants, claiming that the defendants infringe the patents-in-suit by making, using, or selling various computer products, including hard drives, that contain a diamond like coating. The patents-in-suit—the '797 patent and the '660 patent—claim nanophase diamond films with specific properties. On September 13, 2010, six months after Plaintiffs filed suit, Dr. Wagal filed his motion to intervene.

1

There is no dispute that Dr. Wagal co-invented with Plaintiff Carl B. Collins ("Dr. Collins"), the method and apparatus claimed in the parent patent to the two patents-in-suit, United States Patent No. 4,987,007 ("the '007 patent"), while both were employed by the University of Texas at Dallas ("UTD"). The '007 patent, entitled "Method and Apparatus for Producing a Layer of Material from a Laser Ion Source," issued on January 22, 1991 to both Dr. Wagal and Dr. Collins. However, the parties do dispute whether Dr. Wagal should be named as an inventor in the patents-in-suit, which are continuations-in-part to the '007 patent. Dr. Wagal claims that he is the inventor of the apparatus used by Collins and Plaintiff Farzin Davanloo ("Dr. Davanloo") in making the films claimed in the '797 and '650 patents and, thus, contributed to the conception of the invention claimed in the '797 and '650 patents. Additionally, Dr. Wagal claims that he conceived of and made films with the apparatus taught in the '007 patent, including diamond-like carbon layers. Thus, Dr. Wagal argues that he collaborated with Collins on the inventions claimed in the '797 and '650 patents. The patents-in-suit are continuations-in-part of the '007 patent, and Dr. Wagal argues that the apparatus claimed in the '007 patent was used by Drs. Collins and Davanloo in making the films claimed in the patents-in-suit. Accordingly, Dr. Wagal argues that he is a co-inventor of the '797 and '660 patents and is entitled to his proportionate interest in any recovery obtained in this lawsuit by Plaintiffs.

Plaintiffs, however, argue that Dr. Wagal's motion lacks any evidence of inventorship of any of the claims in the patents-in-suit, much less the strict factual corroboration required to satisfy Dr. Wagal's burden to prove co-inventorship of the patents-in-suit by clear and convincing evidence. Dr. Wagal's motion and supporting affidavits rely primarily on evidence that Dr. Wagal invented, or co-invented, the method and apparatus claimed in the '007 patent, but

Plaintiffs argue that he has offered no evidence that he participated in the invention of the patents-in-suit. Accordingly, Plaintiffs argue that Dr. Wagal has failed to demonstrate that he possesses an interest in this lawsuit. Plaintiffs also argue that Dr. Wagal did not contribute to the conception of any claim of the patents-in-suit. Plaintiffs argue that, as continuations-in-part of the '007 patent, the patents-in-suit must contain material not disclosed in the '007 patent. Additionally, Plaintiffs argue that none of the claims of the patents-in-suit claim priority to the '007 patent and are not supported by what is described in the '007 patent. Additionally, Plaintiffs contend that the patented nanophase diamond films that are covered by the patents-in-suit were conceived solely by Plaintiffs as a result of work performed by them subsequent to Dr. Wagal's departure from the University of Texas at Dallas, while Dr. Wagal was living in India. Plaintiffs also argue that the method and apparatus invented by Wagal in early 1988 and described in the '007 patent are not the method and apparatus used by Plaintiffs to create the patented nanophase diamond films covered by the patents-in-suit and could never have produced the Patented Nanophase Diamond Films. Finally, Plaintiffs contend that even if Dr. Wagal were a co-inventor of the patents-in-suit, he has no standing to sue for infringement of the patents-in-suit because he has no ownership interest in the patents.

Plaintiffs also argue that Dr. Wagal's inventorship challenge is barred by laches because Dr. Wagal waited thirteen years after he was made aware of the patents-in-suit to challenge the inventorship of those patents. The patents-in suit issued in 1995 to Plaintiffs, but were assigned to the University of Texas System ("UT System") based on language in the Plaintiffs' employment contract with UTD. Dr. Wagal learned of the patents-in-suit and the fact that Plaintiffs were listed as the inventors of the patents-in-suit in at least 1997. That year, the UT System sent a letter to

Dr. Wagal explaining a decision by the UT System to distribute royalties on four patents, including the '007 patent and the two-patents in suit, in a certain manner. Under the distribution agreement, Dr. Wagal was to receive a percentage of royalty payments based on his co-invention of the '007 patent. The letter communicating the distribution agreement listed the inventors of both patents-in-suit as Plaintiffs Collins and Davanloo. Dr. Wagal also filed a state court lawsuit against UTD and the UT System on October 23, 1995 that was pending until 2001. Dr. Wagal's petition in that case alleged that the ideas in the patents-in-suit "originated from and purport to be improvement on" the '007 patent. However, the cause of action in that case dealt solely with royalty payments and not with inventorship. Finally, Dr. Wagal failed to bring a claim to correct inventorship during a previous infringement suit Plaintiffs brought against The Gillette Company ("Gillette") in 2004. Dr. Wagal received a settlement from Gillette in that suit, but did not move to intervene in that suit to correct inventorship.

## II. Analysis

35 U.S. C. § 256 "provides a cause of action to interested parties to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent." *Larson v. Correct Craft,Inc.*, 569 F.3d 1319, 1324 (Fed. Cir. 2009) (quoting *Fina Oil & Chem. V. Ewen*, 123 F.3d 1466, 1471 (Fed. Cir. 1997). It states:

> Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.
>
> The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

35 U.S.C. § 256. The Federal Circuit has interpreted Section 256 as a "savings provision" to prevent patent rights from being extinguished because the inventors were not correctly listed. *Larson*, 567 F.3d at 1324; *Chou v. Univ. of Chicago*, 254 F.3d 1347, 1358 (Fed. Cir. 2001); *Pannu v. Iolab Corp.* 155 F.3d 1344, 1349 (Fed. Cir. 1998). Although Dr. Wagal does not specifically request relief under Section 256, the Court will treat his request to intervene to establish that he is a co-inventor of the two patents-in-suit as a request to correct the inventorship of the patents-in-suit under Section 256. *See Larson*, 569 F.3d at 1325 ("we have treated requests for declaratory relief related to inventorship as functional equivalents of actions formally brought pursuant to § 256").

First, the Court will address the issue of laches. "Laches is an equitable defense that may bar an inventorship claim." *Serdarevic v. Advance Med. Optics, Inc.*, 532 F.3d 1352, 1358 (Fed. Cir. 2008). Determining when laches applies is committed to the sound discretion of the district court. *Id*. In making its determination, "[a] court must look at all of the particular facts and circumstances of each case and weigh the equities of the parties." *Hor v. Chu*, -- F. Supp. 2d --, 20011 WL 248378, *9 (S.D. Tex. 2011) (citing *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992)). To invoke a laches defense, the defendant bears the burden of proving that (1) the plaintiff delayed in filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant and (2) the delay operated to the prejudice or injury of the defendant. *Aukerman*, 960 F.2d at 1032. "Both of these factual premises must be met, predicate to the weighing of the facts of delay and prejudice to determine whether justice requires that the claim be barred." *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys. Inc.*, 988 F.2d 1157, 1161 (Fed.

Cir. 1993).

When applying laches in order to bar a claim, "the period of delay is measured from when the claimant had actual notice of the claim or would have reasonably been expected to inquire about the subject matter." *Advanced Cardiovascular Sys.*, 988 F.2d at 1161. "[T]he plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided that facts already known by him are such as to put upon a man of ordinary intelligence the duty of inquiry." *Id*. at 1162. A delay of more than six years after the omitted inventor know or should have known of the claim will produce a rebuttable presumption of laches. *Id* at 1163. Once the presumption of laches attaches, a party can remain "utterly mute" on the issue of prejudiced and nonetheless prevail. *Serdarevic*, 532 F.3d at 1358. "Where the presumption applies, the two facts '*must* be inferred, absent rebuttal evidence.'" *Moore v. Broadcom Corp.*, 2008 WL 425932, at *3 (N.D. Cal. 2008) (quoting *Aukerman*, 960 F.2d at 1037). The plaintiff may "rebut the presumption of laches by offering evidence to show an excuse for the delay or that the delay was reasonable, or by offering evidence sufficient to place the matters of evidentiary prejudice genuinely at issue." *Serdarevic*, 532 F.3d at 1359-60 (quoting *Aukerman*, 960 F.2d at 1038) (quotations omitted); *see also Hor*, 2001 WL 248378, at *10.

Plaintiffs assert that Dr. Wagal's inventorship challenge is barred by laches because Dr. Wagal waited thirteen years after he was made aware of the patents-in-suit to challenge the inventorship of those patents. Further, Plaintiffs allege that during this thirteen year period, Dr. Wagal had at least three specific opportunities to challenge the inventorship of the patents-in-suit: (1) when he received the royalty division agreement from UT System in 1997; (2) during the course of his state court action involving, at least in part, the patents-in-suit, which was pending

from 1995 until 2001; and (3) during the infringement suit filed by Plaintiffs agaisnt Gillette in 2004.

Specifically, Plaintiffs argue that, in 1997, Dr. Wagal received a communication from UTD regarding the royalty distributions for various patents, including the '007 patent, the patents-in-suit, and one additional patent. The letter lists the inventors of the '797 patent and the '650 patent as Plaintiffs Collins and Davanloo alone. However, Dr. Wagal did not bring a claim to correct inventorship until his motion to intervene was filed in this case thirteen years later. Additionally, Plaintiffs argue that Dr. Wagal failed to challenge the inventorship of the patents-in-suit in a state court lawsuit he brought against UTD and the UT System in 1995 regarding the distribution of royalty payments of the '007 patent. Dr. Wagal's petition in that case sought certain royalty payments, primarily regardign the '007 patent, but also mentioned the patents-in-suit and his belief that the ideas in the patents-in-suit "originated from and purport to be improvement on" the '007 patent. However, the cause of action in that case dealt solely with royalty payments and not with inventorship. Finally, Plaintiffs argue that Wagal was aware of Plaintiffs' previous infringement suit against The Gillette Company but did not challenge inventorship in that suit either, although he did receive a settlement payment directly from Gillette.

Dr. Wagal largely concedes the facts underpinning Defendants' laches argument. However, he argues that Plaintiffs have not demonstrated that they would be prejudiced by Dr. Wagal's intervention and, thus, that baring the claim based on laches is unwarranted. Dr. Wagal also argues that he waited so long to bring a claim for inventorship because he was, until recently, receiving certain royalty payments for the patents-in-suit based on the royalty distribution agreement created by UTD in 1997. Dr. Wagal argues that it was not until the UT System

assigned the patents to Plaintiffs that he stopped receiving payments and that the suit to correct inventorship was necessary. However, the Court finds Dr. Wagal's arguments unpersuasive. First, Dr. Wagal's thirteen year delay in seeking to correct inventorship is more than twice as long as the six year delay the Federal Circuit has found creates a rebuttable presumption of laches. *See Advanced Cardiovascular Sys.*, 988 F.2d at 1163. Second, Dr. Wagal's stated in his briefing that he no longer has access to his research notebooks from the time period during which he worked for UTD and invented the '007 patent. The record suggests that these notebooks may have been lost to the passage of time. According to Dr. Wagal, these notebooks would prove his contribution to the inventorship of the patents-in-suit; however, Plaintiffs argue that these notebooks would prove that Dr. Wagal did not contribute to the invention of the claims of the patents-in-suit. The fact that Plaintiffs no longer have access to this potentially critical source of proof demonstrates that Plaintiffs have, in fact, suffered prejudice because of Dr. Wagal's thirteen year delay in filing suit to correct inventorship. Finally, the fact that Dr. Wagal may have a percentage of royalty payments made on a group of patents, which including the patents-in-suit, does not excuse his failure to sue to correct inventorship for over thirteen years.

At the hearing, Dr. Wagal offered a new argument to defend against laches. Citing *Xechem International, Inc. v. University of Texas M.D. Anderson Cancer Center*, 382 F.3d 1324 (Fed. Cir. 2004), Dr. Wagal argued that even if he had attempted to correct the inventorship of the patents-in-suit earlier, he could not have brought a suit to correct inventorship against the UT System. Accordingly, Dr. Wagal argues that he did not have the right to file suit to correct inventorship until he learned that the UT System assigned the patents-in-suit to Plaintiffs in 2005. Importantly, Dr. Wagal offers this argument as a new justification of this failure to bring suit, but

he does not claim that this is the actual reason he failed to bring suit to correct inventorship earlier. In fact, Dr. Wagal had a lawsuit pending against the University in Texas state court from 1995-2001, during the exact time he claims he could not sue the University to correct inventorship. At no point during the pendency of this state court litigation did Dr. Wagal assert coinventorship of the patents-in-suit.

The issue in *Xechem International* was whether a state university was subject to suit in federal court to obtain correction of inventorship. 382 F.3d at 1326. The Federal Circuit held that the state university had not waived its Eleventh Amendment immunity and, thus, was not subject to a suit to correct inventorship in federal court. *Id*. at 1329-1332. However, the Eleventh Amendment applies only to suits in *federal court* against an arm of the state, it has no bearing on whether suit can be brought in *state court* on the same grounds. *See* Amendment XI to the United States Constitution ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State"). In fact, *Xechem International* reiterated that Eleventh Amendment immunity may be abrogated "only where the State provides no remedy, or inadequate remedies." *Id*. at 1328. That suits for correction of inventorship may be filed in state court because "[f]ederal preemption of causes arising under the Patent Act does not include matters of ownership or license." *Id*. at 1332 (citing *Jim Arnold Corp. v. Hydrotech Sys., inc.*, 109 F.3d 1567, 1577 (Fed. Cir. 1997)). Accordingly, *Xechem International* makes it clear that Dr. Wagal could have pursued correction of inventorship in state court and, if he had he been unable to obtain an adequate remedy at the state level, he could have made a sufficient showing of such and pursued his claim at the federal level. *See Xechem*

*International*, 382 F.3d at 1332.

The Court holds that Dr. Wagal's failure, in the fifteen years since the patents-in-suit issued, to file suit to correct inventorship, despite the fact that (1) he was aware of the patetns-in-suit for at least thirteen of those fifteen years, (2) he was aware of at least one other infringement suit based on the patents-in-suit, and (3) he brought his own state-court action involving the patents-in-suit without claiming inventorship, was an unreasonable and inexcusable delay and that this extraordinary delay prejudiced Plaintiffs. Accordingly, the Court finds that Dr. Wagal's motion to intervene is barred by laches.

Because the Court finds that Dr. Wagal's inventorship claim is barred by laches, it need not address the merits of Dr. Wagal's claim to inventorship or whether Dr. Wagal would have standing to sue for infringement of the patents-in-suit if he is, in fact, a co-inventor of the patents-in-suit.

**III. Conclusion**

For the reasons discussed above, the Court DENIES Dr. Wagal's Motion to Intervene (Dkt. No. 201).

SIGNED this 29th day of August, 2011.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE